Myrtie S. Bennett v. First National Bank of Waterloo, Iowa.

Gen. No. 11,328.

1. BILL IN EQUITY—*who cannot maintain.* A person who has not a substantial equitable interest in the subject-matter of the controversy, cannot maintain a suit in equity thereon.

2. OWNER OF NOTES—*what does not affect right of, to maintain foreclosure.* Where the complainant in a bill to foreclose is *prima facie* the owner of notes secured by the trust deed sought to be foreclosed, it is immaterial if such owner at the time of receiving the same by assignment entered into some arrangement with its assignor by which such assignor agreed to reimburse it upon its failure to collect the same.

3. OWNERSHIP OF NOTES—*what overcomes prima facie case arising from possession and production.* Such *prima facie* case is overcome by

evidence introduced by a defendant and cross-complainant claiming title to notes secured by the trust deed sought to be foreclosed, by which it is established that the same were the property of the cross-complainant, and were tortiously taken from her by one through whom by mesne conveyances the complainant acquired its alleged title, as well as by evidence which establishes that such notes were the property of one other than the complainant in such bill who, retaining the ownership of such notes to the time of his death, had by will made such defendant his sole devisee.

4. GIFT CAUSA MORTIS—*what is not.* Although such a gift is revocable by the donor upon recovery, it must be in itself when made absolute, and not a delivery to a third person to return on recovery of the donor, and to make over to the donee only on the contingency of the donor's death.

5. GIFT CAUSA MORTIS—*effect of pre-existing indebtedness existing in favor of donee.* The fact that there existed in favor of the donee an indebtedness due from the donor, does not supply the defects of an attempted gift *causa mortis.*

6. TITLE TO NOTES—*what essential to pass.* Valid delivery is essential to pass the title to notes secured by trust deed.

Foreclosure proceeding. Error to the Circuit Court of Cook County; the Hon. EDWARD F. DUNNE, Judge, presiding. Heard in this court at the March term, 1904. Reversed and remanded with directions. Opinion filed December 15, 1904.

A. C. NOBLE, for plaintiff in error; IVES, MASON & WYMAN, of counsel.

ASHCRAFT & ASHCRAFT, for defendant in error; E. M. ASHCRAFT, of counsel.

MR. JUSTICE BROWN delivered the opinion of the court.

This is a writ of error to the Circuit Court of Cook county, by which it is sought to reverse a decree of sale in a foreclosure suit obtained by the defendant in error in that court.

The contention turns upon the ownership of the notes secured by the trust deed on which the decree of foreclosure sale was entered. Defendant in error claims, and the court below, confirming herein a report of the master to whom the case had been referred, found, that the defendant in error is such owner, and entitled to maintain the suit and to secure the benefit of this decree. The plaintiff in error,

the principal defendant below, denies this, and asserts that by the evidence produced before the master, the *prima facie* case made in this respect in favor of the complainant, the First National Bank of Waterloo, by its production of the notes described in the bill, was overcome, and that the bill of said bank asking the foreclosure should therefore have been dismissed for want of equity.

The claim of plaintiff in error to this effect is twofold. Plaintiff in error insists in the first place, that even under the assumption that one Eliza V. Bennett, (from whom, mediately or immediately, the evidence shows that the notes in question—made by Myrtie S. Bennett to her own order, and endorsed by herself in blank—were obtained by the defendant in error, the First National Bank of Waterloo,) was the legal holder or owner of such notes at the time she transferred them to the bank, or to the bank's assignor, the evidence makes it plain that she so transferred them for collection only, and still retains her beneficial ownership of them. From this it follows, it is urged, that the proper persons are not before the court as parties complainant or otherwise, and the bill should be dismissed.

While it is true, as claimed by counsel for plaintiff in error, that a party who has not the substantial equitable interest in the subject-matter of the controversy cannot maintain a suit in equity as the actual party in interest, we do not think that there is any such showing in the evidence in this cause concerning the transactions with these notes subsequently to their coming into the hands of Eliza V. Bennett, as should overcome the presumption of their beneficial ownership by the complainant, arising from their possession and production by it.

Eliza V. Bennett testified that after she had obtained these notes in the manner which will be hereafter discussed, she took Charles F. Bennett's note for them and turned them over to him, and that he dealt with the bank. If the bank owns the notes (as *prima facie* it would seem to do, if Eliza V. Bennett owned them when she turned them over to Charles F. Bennett), it is immaterial what guaranty or

Bennett v. First Nat. Bank of Waterloo.

arrangement for recoupment or reclamation, if they were not collected, might have been entered into by it with its assignor. No greater right is claimed by defendant in error for itself than Eliza V. Bennett would have had while she held the notes; but we think there is no evidence that it has not as much. If we were to hold that Eliza V. Bennett was the legal holder of, and had the beneficial owner-ship in, the notes in question at the time they were in her hands, we should find no difficulty in sustaining this decree in favor of defendant in error.

But the second branch of the contention of the plaintiff in error raises a much more serious objection to the com-plainant's title to the notes. It is that Eliza V. Bennett, whose claim to have been a legal holder of said notes rests upon her having acquired them from her son, John C. Ben-nett, as collateral security for an outstanding indebtedness from her said son to her, larger than their amount, never was in fact such legal holder of them and never did so ac-quire them as collateral security. It is claimed, on the contrary, that they came into possession of the said Eliza V. Bennett through tortious and unwarranted acts of other parties who had no legal interest in them, and who acted in her behalf.

The plaintiff in error, who is the signer of the notes, al-leges that she, said plaintiff in error, is also the owner and legal holder of them. She claims primarily that she owns them in her individual right, and has always so owned them since they were executed, and that she never parted with such ownership to Eliza V. Bennett or to John C. Bennett, or to any other person. To establish this alleged right to them, and to secure the delivery of the said notes to her, she filed her cross-bill in the court below, which, with the answers thereto, was a part of the pleadings on which the cause was heard and the decree entered.

But, secondarily, she insists that if John C. Bennett, her husband, through whom Eliza V. Bennett, her mother-in-law, claimed the title to these notes, ever was the owner of them, he remained so until his death, and that when that

took place they became a part of his estate, of which, it incidentally appears in the evidence, she is the sole devisee. It is apparent, of course, that if either of these alternative contentions of plaintiff in error is established by the evidence, the *prima facie* case made in favor of the defendant in error by the possession and production of the notes is overthrown, and the decree must be reversed.

A statement of the undisputed facts in the case will show how these contentions arise.

The plaintiff in error is the widow of John C. Bennett, who had formerly been a physician, but who, for some time before his death at Chicago on November 24, 1899, had been a practicing lawyer. His mother resided, or at all events was at Waterloo, Iowa, in 1899, and was then over seventy years old. Dr. Bennett visited with her there in August of that year, and while there received from her six thousand dollars, to represent which he gave her a note reading as follows:

"SEPT. 1, 1899.

On the 1st day of Sept., 1910, for value received I promise to pay Eliza V. Bennett $7,142.86 with interest thereon at 7% payable quarter yearly.

JOHN C. BENNETT."

Said note had the following indorsement:

"$3,142.86 of the final payment is hereby endorsed and paid but this shall not apply until interest for the whole amount shall have been paid. Dated at Waterloo this eleventh day of September, 1899, before delivery."

He seems contemporaneously to have said to his mother that he had some transactions in Chicago in which he could use $6,000 with profit, and out of some of those transactions he would provide her security for the note. Dr. Bennett returned to Chicago on October 15, 1899, and on October 20 he wrote to his mother a letter which contains the following: "Your letters have come duly to hand and have suggested an uneasiness as to securities and monies. * * * As to your interests I have arranged to give you as collateral a $2,500 1st mtge. bond and coupons on 418 Warren

and this with the Chicago Title & Trust Co.'s guarantee that it is a first lien thereon and it draws 7% due in five years. This is cashable any day and is worth more than its face. It is not for sale. Yesterday I bought in your name a judgment against 420 Warren Ave. and another property for $1,800 first lien, which gives me control of that place. This makes $4,300. * * * The remainder will in due time be equally well placed for your safety. It will take a few days for the Abstract Co to get prop. in shape, so I shall not send them possibly till you come, or to Peoria. It will require care or risk in sending them through the mails. I shall try and have these such that if you get too much worried and any of the ' heirs' have a better place for your means I can give ' them ' the cash, but you may be sure no one will speculate with your funds until I am compelled to allow it. I have agreed to give you a large sum for your money, and am in shape and place to do it, but if the 'heirs' want to do otherwise I may allow you to let them. * * *

Your affect. son,

JOHN C. BENNETT."

The " $2,500 first mortgage bond and coupons on 418 Warren avenue," which this letter mentions, are the note and coupons sought to be foreclosed in this suit. They had their origin as follows :

On December 15, 1897, an incumbrance had been made on the property at 418 Warren avenue by one Giles and wife, the owners, to secure a loan of $2,000 made by the Chicago Title & Trust Co. as guardian of the estate of a minor, unconnected with this litigation. On June 7, 1899, John C. Bennett, having been, apparently, reproached by officers of the trust company for recommending to it this loan to the Giles, which, as interest was defaulted, was not therefore satisfactory, took up the same from the trust company and paid therefor $2,121. Dr. Bennett then gave the notes and trust deed to a lawyer, a Mr. Eley, who prepared a bill to foreclose on them, which was afterward filed. The bill was brought in the name of John C. Bennett. A

settlement was afterward reached of the suit against the Giles on this note and trust deed, which resulted in the release of the incumbrance for $2,000—in a warranty deed of the said premises from Sarah J. Giles and George Giles, her husband, to Myrtie S. Bennett, said deed being dated September 20, 1899, acknowledged October 6, 1899, and recorded October 17, 1899—the payment of $100 to Sarah J. Giles by Myrtie S. Bennett, and a written option of repurchase given by Myrtie S. Bennett to Sarah J. Giles, whereby said Myrtie S. Bennett agreed to reconvey to said Sarah J. Giles the said premises at any time on or before October 1, 1900, for the sum of $2,850, or the difference between $2,850 and any incumbrance less than $2,850 which Myrtie S. Bennett might put upon the premises, under the agreement in said option contract contained. Said agreement was that Myrtie S. Bennett might at any time before October 1, 1900, and before Sarah J. Giles repurchased, put an incumbrance, by trust deed or otherwise, upon said property for any sum less than $2,850, and for a term not to exceed five years, at a rate of interest not to exceed seven per cent per annum. Myrtie S. Bennett then executed a promissory note for $2,500, dated October 1, 1899, and due five years after date, with interest at the rate of seven per cent per annum, and ten coupon interest notes for $87.50 each, payable at intervals of six months until the maturity of the principal note. To secure these notes Myrtie S. Bennett and John C. Bennett, her husband, executed a trust deed to the Chicago Title & Trust Co. of the premises legally described as the west ten feet of lot fifty-four, and the east ten feet of lot fifty-five in block fifty-eight in the Canal Trustees' Subdivision of section seven in township thirty-nine north, etc., and known as 418 Warren avenue. This trust deed was dated October 1, 1899, acknowledged by both Myrtie S. and John C. Bennett on October 19, 1899, and recorded on October 20, 1899. These are the notes and trust deed which are the basis of the suit at bar. The trust deed and notes were prepared in the office of the Chicago Title & Trust Company, and the trust deed was

left with that company to be sent to record. It was so sent, was returned by the Recorder's office to the Chicago Title & Trust Company, and by that company delivered to Mrs. Myrtie S. Bennett probably more than a month after it was left for record, and after the death of her husband, John C. Bennett. It remained in the possession of the plaintiff in error, Myrtie S. Bennett, until on the hearing of this case before the master it was produced by her in conformity with a notice served upon her counsel, offered and received in evidence and impounded.

The whereabouts of the notes from the time they were executed up to some time in November of the same year, is the subject of conflicting evidence; but it is certain that on November 15, 1899, they were in a safety deposit box in the vault rooms of Taylor A. Snow & Company at 959 Madison street, in Chicago, which box had been rented by Myrtie S. Bennett on November 2, 1899, and had stood from that time in her name. Previous to that, and in October, John C. Bennett had been taken ill with typhoid fever, and on the 28th of October he had taken to his bed, to which he was confined until his death, which occurred on November 24, 1899.

At some time in November, before the 15th (respecting the exact date there are conflicting contentions), he gave some papers (whether or not these notes were among them is also a matter of contention) to one Ella Lowe, who was then living at his house, asking her, according to her testimony, to deposit them in a vault at Mr. Snow's, saying, "*If I die*, hand them to my mother, *if she will accept five per cent; if not, return them to Myrtie and let her, my mother, get what she can.*" At another point in her testimony Miss Lowe says, " He took the papers and handed them to me; said that I was to keep them or take them and deposit them in the vault as security for his mother, Mrs. Eliza Bennett." And at still another, that " she was to return them to him if he didn't die." Miss Lowe says she carried the papers to her room, put them in her trunk and kept them there for two or three days, and that then she and

Myrtie S. Bennett went together to the Snow vaults, where a box was hired in the name of Myrtie S. Bennett at her, Miss Lowe's, suggestion, and the papers which Miss Lowe had were put into it. On November 15, 1899, John C. Bennett, who was frequently at least in an excited condition and very nervous and irritable from his fever during his illness, declared that he wanted the papers which were in the Snow vault, and which, it is to be supposed from what had previously taken place, he thought were in a box in Ella Lowe's name, put in the possession of his sister, one Dr. Parker, who was a physician, and who, although residing at Peoria, had been with him much during his illness. He did not, according to Mrs. Parker's testimony, tell her what the papers were, but she says that at the time she knew that he had received $6,000 from her mother, and she *supposed* the papers were her mother's security. As the conversation on this subject between John C. Bennett and Mrs. Parker is, in our view of this cause, one of the very vital points on which our action must turn, we quote from the record Mrs. Parker's statements of what occurred and what was said between them :

"Dr. Merrill was in the sick room. Mrs. Myrtie Bennett came to me—I was somewhere in the front part of the house, and said, 'John is talking to Dr. Merrill about ma's business, and I wish you would go in and quiet him.' I went in the room and the minute he saw me he says, 'Dr. Merrill, there is the girl—I want you to put those papers in her possession. I want you to put the box in her name.' * * * The minute John saw me, before I had a chance to say anything to him, he says, 'There is the girl'—those are the words he said. 'Put that box in her name;' and I immediately said, 'John, don't do anything more about that business until you get well; then fix it up to suit yourself.' He says, 'There is no use talking to me; I will not be quiet until Dr. Merrill comes back and tells me the box is in your name or your possession.' * * * He points his finger at Mrs. Myrtie Bennett and he says, 'Donna, she wants to get those papers in her possession.' * * *

He says, 'Go now with Ella Lowe and Dr. Merrill and get those papers put in your name, and Dr. Merrill come back and tell me that it is done.' * * * After the thing was all quieted down at that time, I cannot say whether it was that afternoon of the same day or the next day, I said to Mrs. Myrtie Bennett, 'What papers are these?' 'Why,' she says, 'they are ma's papers, they are your mother's papers to secure her property.' Up to that time I knew nothing about what the papers were—what was the contents of the vault."

Further on in her direct testimony this occurs:

"Q. Now, was there any arrangement with you as to what should be done with these papers if your brother got well? A. My brother said it was to—*that I was to hold them in escrow for my mother in case of his death, but if he lived I was to deliver them to him.*

Q. Was there anything said about the rate of interest? * * * A. My brother said to me, if I remember right —the same time that the papers were transferred, it was during that same conversation—that he said his mother was to get seven per cent, but he expected to make ten per cent out of it for her. * * *

Q. Now, when was it said that if your brother recovered the papers should be turned back to him? A. * * * It was probably the next day after I had received possession of the box that my brother asked me to get the law book and read what it meant as to papers in escrow. * * * I was going to say I didn't know whether that conversation was the same day or whether it was the day following."

On cross-examination Mrs. Parker repeats the conversation as at first given by her, and these questions and answers also occur:

"Q. When he said: 'There is the girl—I want her to have possession of the papers,' did you have any idea what papers he was talking about? A. I didn't know anything about the papers, * * * not more than in a general way; I supposed it was my mother's security.

Q: When he said that, ' There is the girl, I want her to have those papers,' (il he say whose papers they were? A. No, sir; he said it just as I told you.

Q. And that is everything, then, that he said then ? A. Yes, sir.

Q. Is that all the conversation you ever had with him about those papers ? A. After we came back from the vault he wanted to know if I understood what it was to hold the papers in escrow. * * * When we returned, it was probably the same day, he wanted to know if I understood what it meant to hold the papers in escrow *in case of his death* to be delivered to his mother; but he wanted me to go and get a law book, whatever it was, and read to him so that he was sure that he understood. I didn't do it; I put him off.

Q. Now, he told you on this second occasion that you held those in escrow ? A. Yes, sir.

Q. And asked you if you knew what an escrow agreement meant ? A. Yes, sir.

Q. How do you know that the doctor did not know but what the vault was in his wife's name all the time ? A. He asked Dr. Merrill and Ella Lowe and myself to go to the vault and have the box changed from Ella Lowe's name to my name."

As a result of the first conversation between Dr. Bennett and his sister, and after some objection on Mrs. Myrtie S. Bennett's part, Mrs. Myrtie S. Bennett, Dr. Merrill and Dr. Parker went to the vault, where a transfer of the box to the name of Mrs. Parker was made, and both keys, as Mrs. Parker says—or as Mrs. Myrtie S. Bennett seems to imply in her testimony, of one of the keys only—was made to Mrs. Parker. Mr. Snow, the vault proprietor, testified that after November 15, and until November 27, both Mrs. Parker and Mrs. Bennett had the right of access to the box. On November 27 it was retransferred to Myrtie S. Bennett solely.

John C. Bennett died on November 24. On November 25 Mrs. Parker, accompanied by her brother, Garrett Ben-

nett, only, went to the box and examined the papers in it. They found there two certificates of deposit on some bank or banks, amounting to about $1,500, an assignment to Eliza V. Bennett of a judgment for $1,800, which is called the Sarl judgment and undoubtedly was the judgment referred to in Dr. Bennett's letter to Eliza V. Bennett of October 20, and the $2,500 note and coupons in question here, signed by Myrtie S. Bennett. They left all these papers in the box, but on November 27, the day after Dr. Bennett's funeral, they called for Mrs. Myrtie S. Bennett, and with her again went to the Snow vaults, where, at least without the affirmative action or consent of Myrtie S. Bennett, they took from the box all the papers above enumerated. The certificates of deposit they cashed at a Chicago bank, and the money realized on them, together with the assignment of judgment and the note and coupons involved in this cause, they carried to Peoria and turned over to Eliza V. Bennett. From this delivery to Eliza V. Bennett and her subsequent dealing with the paper, the alleged right of the defendant in error to maintain its suit sprang.

We have given above a statement only of undisputed matters. There are several questions arising in the cause concerning which there is greater or less conflict of evidence.

The original ownership of the $2,500 note executed by Myrtie S. Bennett is in dispute, and this is connected with the subsidiary question of the ownership of the precedent Giles mortgage. Plaintiff in error insists that she owned the Giles mortgage after it was taken up by Dr. Bennett at the Chicago Title & Trust Co., and that she has at all times since their execution owned the notes made by herself and secured by the trust deed which is in her possession, and that they represent no liability or indebtedness of hers to anybody; and she gave and produced testimony tending to prove this.

Defendant in error, on the other hand, contends, and produced evidence tending to prove, that Dr. John C. Ben-

nett owned the Giles mortgage and paid for it from his own resources, and that the execution of the note for $2,500 and coupons and trust deed securing the same by Myrtie S. Bennett was for the purpose—since the title to the property was put into her hands on the foreclosure settlement—of enabling her to give to John C. Bennett, who had owned the Giles mortgage, the proper security to represent it and take its place.

It is also disputed whether this $2,500 note and coupons of Myrtie S. Bennett were among the papers which were given by John C. Bennett, after he became ill, to Ella Lowe and by her placed in the Snow vault deposit box. The plaintiff in error swears that they were not, but that the box had been leased by her before Miss Lowe and she together went to it and placed therein the assignment of judgment and certificates of deposit, which she alleges were the only documents given by Dr. Bennett to Miss Lowe. She says that the $2,500 note and coupons and mortgage insurance policy were placed in the box by herself at some time before or after that day. It is urged on her behalf, also, that circumstances corroborate this claim of hers.

On the other hand, the defendant in error claims that Dr. Bennett gave this $2,500 note and coupons to Miss Lowe with the assignment of judgment and certificates of deposit, and that they were all placed in the safety deposit box together by Miss Lowe at the time the box was first rented in the name of Myrtie S. Bennett.

It is disputed, or at least left somewhat doubtful in the testimony, whether Mrs. Eliza V. Bennett was at the house of Dr. Bennett at the time of the delivery of papers before described by Dr. Bennett to Ella Lowe, and on November 15, at the time of the transfer of the box to Mrs. Parker. Mrs. Myrtie S. Bennett says that Mrs. Eliza Bennett "was at the house while Dr. Bennett was sick." Miss Lowe testifies that she thinks Mrs. Eliza Bennett was at the house while she, Miss Lowe, had the papers in her trunk, and that she talked with Mrs. Eliza Bennett about them after they had been put into the vault, which she says she thinks was

three or four days only before the box was transferred to Dr. Parker.

Dr. Parker, who says she came from Peoria to be with her brother on November 3, and went home on the 11th, returned again on the 13th, and left again on the 19th or 20th, was asked: "Was your mother at Peoria at the time you left the second time, or where was she?" and answered, "I do not remember the date my mother left here for Peoria, and it is hard for me to say whether she was in Peoria the day I came back the second time or not." Being, however, further pressed by the question, "Was she here the day that those keys were given you?" she answered: "I think not, I am sure not."

It is disputed whether or not at the time of the delivery of papers by Dr. Bennett to Miss Lowe, and at the time of the transfer of the box to Mrs. Parker at his suggestion, he was sane, or so affected by the fever as to be delirious and incapable of legally binding action. It is disputed whether Myrtie S. Bennett voluntarily had the safety deposit box transferred to Mrs. Parker and gave up all the keys to her, or whether she surrendered the entire control of it only under vigorous protest and on the representation that her husband's life depended on it, and only upon condition that she herself should also have access to the box, and that Dr. Parker would not touch the contents of the box and would not go to it, except with her knowledge.

It is disputed whether or not, shortly after the transfer of the box to Mrs. Parker, and before the papers were taken away by Mrs. Parker and Garrett Bennett, Mrs. Myrtie S. Bennett referred, speaking to Mrs. Parker, to all the papers in the box as "your mother's papers, to secure her property." It is also disputed whether Myrtie S. Bennett allowed the $2,500 note and coupons and mortgage policy to be taken out of the safety deposit box on November 27, without any particular objection, or whether, on the contrary, she vigorously protested against that act, and only allowed it because physically powerless to prevent it. But, assuming that in connection with the undisputed evidence, an answer

favorable to the defendant in error should be given to every one of these disputed questions—that is, assuming that Dr. John C. Bennett owned the Giles mortgage and the $2,500 note signed by Myrtie S. Bennett; that this $2,500 note and coupons and mortgage policy were among the papers given by Dr. Bennett to Miss Lowe, and by Miss Lowe put into the box taken in Myrtie S. Bennett's name; that Eliza V. Bennett was not at Dr. Bennett's house on November 15, 1399; that at all times during his illness Dr. Bennett was sane and rational enough to understand and be able to attend to his business affairs; that Mrs. Myrtie S. Bennett consented to the transfer of the safety deposit box to Mrs. Parker without serious objection, and gave her both keys and full control thereof; that shortly after the said transfer she spoke to Mrs. Parker of the box as containing Mrs. Eliza Bennett's papers, and said that among them was the $2,500 note signed by her; and, finally, that she allowed, without particular objection, on November 27, the $2,500 note and accompanying coupons and policy to be taken out of the box and carried away by Garrett Bennett and Mrs. Parker— still we are of opinion there would be no sufficient ground for holding that Eliza V. Bennett ever became the legal holder of the note and coupons in question, and, consequently, for sustaining the master's report and the decree of the court below in this case.

It would appear from the record that the position was at one time taken before the master, that before the alleged delivery of the note in controversy to Miss Lowe, and before, of course, therefore, the transfer of the safety deposit box to Mrs. Parker, Mrs. Eliza V. Bennett had become the legal holder of the note as collateral security for the indebtedness of Dr. Bennett to her. We do not understand that position is now taken by the defendant in error; but if it were, it could not be sustained. It would rest entirely on the letter of Dr. Bennett to his mother, dated October 20, 1899. Conceding that this letter was admissible in evidence, on the assumption that Dr. Bennett then owned the $2,500 note therein referred to, it cannot be construed as

anything more than a declaration of an intention to give in the future the $2,500 note as security for his own existing indebtedness.    To so construe it as to make it a declaration of trust that he held as his mother's agent or representative the security in question, and to hold that it made, through such declaration, Mrs. Eliza Bennett the legal holder of the paper, would be to distort the plain meaning of language and to wrest the law from well-established principles.    If this letter did not constitute Mrs. Eliza V. Bennett the legal holder of the notes, there was nothing else to do so but the delivery of the papers to Miss Lowe and the transfer of the box to Mrs. Parker.    That these things did so is the finding of the master, confirmed by the court below.

The master's third finding, on which the fourth and conclusive one is entirely based, is that "John C. Bennett in his lifetime and while sane, gave through Ella Lowe and Mrs. Parker the said notes secured by the trust deed to his mother, Eliza V. Bennett."    With this conclusion we are unable to agree.    The delivery to Miss Lowe by Dr. Bennett was, according to her own testimony, to hold the papers and return them to him if he did not die, and if he did, only to give them to his mother on certain definite conditions. This plainly appears to us, not a delivery to an agent or representative of Mrs. Eliza Bennett—which could alone give to the act the significance put upon it by the master and the court below—but a delivery by Dr. Bennett to an agent of his own, which agency he revoked on November 15, when he directed the papers of which Miss Lowe had control to be turned over to Mrs. Parker.    Nor was the delivery to Mrs. Parker a delivery to an agent of Mrs. Eliza V. Bennett.    The testimony of Mrs. Parker leaves it somewhat in doubt just when Dr. Bennett gave her instructions as to the disposition of the papers, but it is clear from her testimony that he said nothing to her about their being for his mother, until he coupled with it the provision about what he called an "escrow"—namely, in Mrs. Parker's language, "that I was to hold them in escrow for my mother in case of his death, but if he lived I was to deliver them

to him." This was, equally with the delivery to Miss Lowe, a delivery to an agent of his own—not of his mother's— and this agency was entirely terminated by the death of Dr. Bennett on November 24.

As the Supreme Court of Illinois says in Rapp v. Phenix Ins. Co., 113 Ill. 390, 397, "It is a familiar rule of law that requires no citation of authority for its support, that the death of a principal is *per se* a revocation of the agent's authority, and hence all contracts or other engagements subsequently entered into by the latter on behalf of the principal are absolutely void as to his legal representatives."

It is not necessary to discuss the question of gifts *causa mortis*, for counsel for defendant in error disclaim any reliance on the transaction as such a gift. But it may be well to say that as a gift *causa mortis*, it could not be sustained, because, although such a gift is revocable by the donor upon his recovery, it must be in itself when made absolute, and not a delivery to a third person to return on recovery of the donor, and to make over to the donee only on the contingency of his death. Nor do we know of any rule of law which makes such a disposition of property, with such instructions, to a third person, any more valid and enforceable when there is the consideration of a pre-existing indebtedness, than when it is a gift. Of the cases cited by defendant in error on this point, Hagemann, Adm'rs, v. Hagemann, 204 Ill. 378, is evidently not germane to this case. It decides nothing more than that a full and complete gift between living persons is not to be held revoked because the donor borrows the thing given from the donee and happens to have it with him when he dies. Nor can Lang v. Dietz, 191 Ill. 161, affirming 93 Ill. App. 148, be considered authority for the position of defendant in error. Its decision in the Supreme Court seems to turn largely on the fact that the husband of Mrs. Lang, who set up the invalidity of a contract made by his deceased wife, had himself participated in its making, and received and was enjoying the consideration therefor. It is true that the opinion

of Judge Horton in the Appellate Court, while discussing principally the question of consideration for the note which Mrs. Lang executed to her niece's order before her death, mentions incidentally that the trust deed and the note were given to the witness Oehman (the notary who prepared them) by Mrs. Lang to take care of them, and *if she should die*, to have the trust deed *recorded* with the quit-claim deed to her husband, with directions to *record* the trust deed first." But it does not appear that there were any instructions that the note or even the trust deed were to be redelivered to Mrs. Lang in case she recovered. The note and trust deed were treated by both courts as an executed and delivered contract on a valid consideration, to which appellant's ancestor in title was a party. The questions involved in the case at bar were not present in it nor considered.

While, as we have said, there is dispute as to the willingness with which Mrs. Myrtie S. Bennett consented to the transfer of the box which contained the note in controversy, or the vigor of the protest she made against the removal of that note from the box, we think there can be no successful contention made that she consented to any broader or more decisive disposition of the security than her husband had made. We say this because counsel urge in their argument that even if plaintiff in error, rather than Dr. Bennett, owned the note, it was hypothecated by her to secure the debt of Eliza V. Bennett. This does not seem to us borne out by the record. At the very utmost, all that could be said of her acquiescence was that it was acquiescence in her husband's intent and act, and as these latter were not effectual to carry the title to the note to Mrs. Eliza V. Bennett, her acquiescence in them could not be.

We have assumed as indicated, in disposing of this cause on the grounds stated, among the other disputed points, that Mrs. Eliza V. Bennett was not at Dr. Bennett's house on November 15. But she was certainly there before that time during his illness, and while he was, as the evidence shows, worrying about a proper arrangement concerning the debt due to her. The argument that if he intended an

actual and decisive delivery to her of the note in question, rather than one which, perhaps without his knowledge, the law did not allow him to make, he would have given it to her directly, still has force, although it be assumed that on the precise day of the transfer she was not in Chicago.

In sustaining on these grounds the fourth and fifth errors assigned, we dispose of the original bill in this cause. We must reverse the decree with instructions to dismiss the bill for want of equity. We are not called upon by the record and the assignments of error to pass upon the proper action of the court below on the cross-bill of Myrtie S. Bennett. Whether it shall allow the cross-bill to go with the original bill or reserve it by special order, is for that court to determine. But in view of the foregoing opinion, we think it proper to say, that in assuming for the purpose of this decision, an answer to the various disputed questions of fact, favorable to the defendant in error, we are not to be understood as making findings on them.

Inasmuch as the considerations we have called attention to are sufficient to dispose of the cause, we do not think it necessary or advisable to discuss the conflicting evidence on these points. Upon the one most material in the consideration of the cross-bill, viz., the ownership of the $2,500 note during John C. Bennett's lifetime, there can be found in the record significant and important matters to support each theory urged. We make no finding on it and express no opinion on it.

We regret that we feel obliged to say that we have found the strictures on the abstract of the record furnished by plaintiff in error in this cause, made by counsel for defendant in error in their brief and in their oral argument, to be justified. The abstract is defective and insufficient, and labor and time of the court which could be ill afforded have been used in consulting at length the record. Counsel should remember that however desirable a thoroughly prepared brief and argument may be to assist the court, it is still more desirable that the work of abstracting the record for the court's use should be fairly, thoroughly and con-

scientiously performed. There will be no costs taxed for the abstract in this case.

*Reversed and remanded with directions to dismiss original bill and for further proceedings not inconsistent with this opinion.*